IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JUDY RAPP, ) | CASE NO. 1:19CV2489 |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE JAMES S. GWIN |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff Judy Rapp ("Rapp") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

In November 2016, Rapp filed applications for DIB and SSI alleging a disability onset date of February 2, 2016. Tr. 215, 222. She alleged disability based on illiteracy and arthritis. Tr. 261. After denials by the state agency initially (Tr. 112, 113) and on reconsideration (Tr. 144, 145), Rapp requested an administrative hearing. Tr. 175. A hearing was held before an Administrative Law Judge ("ALJ") on July 17, 2018. Tr. 29-78. In his October 11, 2018, decision (Tr. 10-22), the ALJ determined that Rapp could perform her past relevant work, *i.e.*, she was not disabled. Tr. 10-11. On August 29, 2019, the Appeals Council denied Rapp's

1

request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Rapp was born in 1963 and was 53 years old on the date she filed her applications. Tr. 220. She graduated from high school. Tr. 56. She worked for a plastics company from 2006-2016 as an injection molding machine tender. Tr. 70, 74.

### B. Relevant Medical Evidence[1]

On February 27, 2017, Rapp had an initial assessment for mental health and counseling at Signature Health, Inc. Tr. 353. The reason for her visit was to have an evaluation for her disability application. Tr. 353. She had no prior history of mental health treatment. Tr. 353. She stated that she was unable to read, which she has struggled with her whole life, and that she can understand words that are read aloud. Tr. 353. She was in special education classes growing up and she often feels "stupid." Tr. 353. She was evaluated by a therapist/supervising clinician and was observed to have some difficulty pronouncing words and several times she flipped her syllables around when she spoke. Tr. 354. She currently worked from home doing contract work assembling pieces. Tr. 354. She reported daily alcohol use since she was 19 and she did not think it was an issue for her. Tr. 354. She reported social avoidance and anxiety; fear of being judged, rejected and ridiculed; frequent worries; fatigue; irritability; some somatic symptoms of panic; and periodic tearfulness and low mood. Tr. 354. She was deemed to have limited insight into her anxiety. Tr. 354. She was diagnosed with anxiety state, alcohol abuse, and problems with primary support group. Tr. 355.

On March 6, 2017, Rapp had her first counseling session with a therapist. Tr. 355. She

---

[1] Rapp only challenges the ALJ's findings that relate to her mental impairments. Accordingly, only the mental health treatment notes are summarized and discussed herein.

described that her anxiety had increased since her adult daughter moved out of the house and left her children for Rapp to raise. Tr. 359. Her adult son currently had custody but Rapp saw them every day after school and feared that her son will give up the kids. Tr. 359.

Rapp returned for counseling on April 4, 2017. She was tearful and friendly, exhibited a blunted mood/affect, and had normal speech/language. Tr. 407. She reiterated feeling stressed about the possibility of taking custody of her grandchildren. Tr. 410. She had cut back on her alcohol consumption but was not ready to stop. Tr. 410. The therapist explored alternative healthy habits and Rapp shared that she had some healthy, supportive people in her life who were able to help get her through the hard times: "I don't talk to a lot of people but the people I do talk to are helpful." Tr. 410. The therapist suggested she return in two-week intervals but Rapp declined, stating that once a month was most helpful for her. Tr. 410.

Rapp returned for counseling on May 9, 2017. Tr. 421. She was cooperative, with good eye contact, normal language/speech, and a blunted affect. Tr. 422. The therapist commented that she had made moderate progress; she was engaged and appeared to be in a more positive mood. Tr. 422. Rapp relayed that she had seen her physician, who put her on medication, but that she was concerned about taking her Tramadol due to her fear of becoming addicted. Tr. 425. The therapist counseled that Tramadol and alcohol together could be potentially dangerous, encouraged her to discuss this with her physician, and Rapp agreed. Tr. 425. They discussed the custody situation with Rapp's grandchildren. Tr. 425. The therapist assisted her with emotion regulation and recognizing her all-or-nothing thinking, and Rapp had some difficulty with insight. Tr. 426. Her anxiety had decreased some by the end of the session; she again declined the therapist's suggestion that she return every two weeks. Tr. 426.

Rapp returned for counseling on June 6, 2017. Tr. 431. She described increased anxiety

due to the fact that she would be gaining custody of her grandchildren. Tr. 431. To cope, she was going to the bar, drinking, talking to friends, and listening to music. Tr. 431. She was taught deep breathing and mindfulness techniques and agreed to use these skills outside the therapy session. Tr. 431.

Rapp returned for counseling on July 11, 2017. Tr. 456. She discussed challenges going to court for custody of her grandchildren. Tr. 456. She felt overwhelmed and was tearful during the session. Tr. 456. She rated her anxiety as 10/10 and felt so tense it was hard to think. Tr. 456. She reported that she had been hearing and seeing things that others did not since she was 13 but it did not bother her: "if you just leave the spirits alone they don't bother you." Tr. 456. She declined a psychiatric evaluation. Tr. 456. Spending time with her grandchildren and taking them to do activities had been beneficial and made her feel better. Tr. 456.

Rapp returned to counseling on August 8, 2017. Tr. 460. Upon exam, she was friendly, had good eye contact, a blunted mood/affect, and loud speech. Tr. 458. She was tearful when discussing stress related to taking custody of her grandchildren. Tr. 460. She was open to suggestions regarding parenting skills and stated that she would utilize more listening with her grandkids. Tr. 460. She was open to meeting with psychiatry if it would help her symptoms. Tr. 460.

Rapp returned to counseling on September 5, 2017. Tr. 461. That day her speech and language were normal. Tr. 462. She stated that her anxiety had decreased and she had been managing better. Tr. 464.

On September 6, 2017, Rapp had a psychiatric evaluation with a mental health certified nurse practitioner. Tr. 470-475. Upon exam, she had fair eye contact and was cooperative; her attention and concentration fluctuated; her mood/affect were frustrated and nervous; her speech

4

was normal and her language was easy to understand; and she was linear in her thought processes, with tight associations and no evidence of psychosis or mania. Tr. 472. She could not read the pamphlet in the office when asked to do so, her memory was intact, and her judgment/insight were considered fair to poor. Tr. 472. Her main concern was sleep disturbance. Tr. 474. She was diagnosed with sleep disturbance, unspecified, and alcohol abuse, unspecified; prescribed medication to help her sleep; and cautioned against mixing her medication with alcohol. Tr. 475.

Rapp returned to counseling on October 31, 2017. Tr. 510. She reported she had been feeling very angry due to taking on the responsibility of caring for her grandchildren and losing her freedom. Tr. 515. The counselor practiced coping skills with Rapp. Tr. 515.

Rapp returned to counseling on November 15, and December 15, 2017. Tr. 516, 522. She was tearful and had a blunted and mood/affect. Tr. 517, 523. She stated in December that she had been less stressed than in previous weeks and was deemed to have made moderate progress. Tr. 523.

Rapp returned for counseling on February 9, 2018. Tr. 540. She was engaged and tearful during her session and shared that her inability to read increased her anxiety and stress. Tr. 545. She had difficulty focusing during the session. Tr. 545. She was instructed on how to use meditation, practiced it during the session, reported it was helpful, and was encouraged to continue to practice the technique outside therapy. Tr. 545.

Rapp returned for counseling on March 16, 2018. Tr. 546. She said she had been learning to cope with her anger and frustration better. Tr. 551. She had learned to yell less and felt less overwhelmed because she was having help raising the grandchildren from their grandfather. Tr. 551.

Rapp returned for counseling on May 8, 2018. Tr. 586. She reported having been stressed due to neighbors and having a skin infection for which she was being treated with antibiotics. Tr. 591. She reported that she had "been a mess" and that she had tried to do her exercises but they did not work that well. Tr. 591.

Rapp returned for counseling on July 2, 2018. Tr. 592. Her neighbors were really "making her crazy" and she was able to recognize that she will start ignoring them. Tr. 597. She had been utilizing her distress tolerance skills but they had not been helping much. Tr. 597. It was noted that her cognitive abilities appeared to interfere with her ability to use emotion regulation skills. Tr. 597. Her anxiety had decreased by keeping herself and her grandchildren busy for the summer and increased when she was left to think alone. Tr. 597.

**C. Opinion Evidence**

**1. Consultative Examiner**

On December 21, 2016, Rapp had a consultative psychological exam with Dr. Konieczny, Ph.D. Tr. 342. Dr. Konieczny administered the Wechsler Adult Intelligence Scale-IV on which Rapp obtained a full scale IQ score of 66, which placed her in the extremely low range of adult intellectual functioning. Tr. 344. Dr. Konieczny diagnosed borderline intellectual functioning and opined that Rapp would have some difficulty or some diminished tolerance in the domains of concentration, persistence or pace, interacting with others, and responding to work pressure. Tr. 345.

**2. State Agency Reviewers**

On January 3, 2017, state agency reviewing psychologist Dr. Haskins, Psy.D., reviewed Rapp's record and opined that Rapp could understand and remember 1-3 step instructions, perform "short cycle" without strict fast paced production demands, maintain superficial

interaction with others and may not supervise others or engage in negotiation, could perform in a relatively static setting without frequent changes in job duties, and could handle tasks without strict time limitations or production standards. Tr. 94-95. On March 29, 2017, Dr. Waggoner, Psy.D., reviewed Rapp's record and agreed with Dr. Haskins's opinion. Tr. 124-126.

### D. Testimonial Evidence

#### 1. Rapp's Testimony

Rapp was represented by counsel and testified at the hearing. Tr. 30. When asked about her mental impairments, Rapp stated that she does not get along with people. Tr. 49. Her problem is mostly anxiety disorder. Tr. 52. It has been a problem for a while. Tr. 50, 52. She sees a counselor at Signature Health and she takes medication for anxiety attacks. Tr. 50. She stopped drinking alcohol six days prior to the hearing when her new rheumatologist told her that quitting drinking would help. Tr. 50-52.

Rapp stated that she has problems driving because she can't keep concentrating on the road. Tr. 53. She has five or six panic attacks when she drives, "That's why I turn my music up." Tr. 53. Turning her music up calms her down. Tr. 54. She gets scared when other people "get crazy on the road." Tr. 54. She limits her driving as much as she can. Tr. 54. She does her own grocery shopping. Tr. 55-56.

Rapp agreed that she had been diagnosed with learning difficulties and borderline intellectual functioning. Tr. 56. She does not know how she was able to graduate from high school. Tr. 56. She has a lot of difficulties reading and writing. Tr. 57. Her son helped her with her social security application by reading the questions to her and sometimes he had to explain to her what her answers meant because she did not understand it. Tr. 58-59. When asked if she had difficulties learning instructions when she worked at a plastics company and at a factory, Rapp

7

stated that they wanted her to read a book but she could not read the book.  Tr. 59.  Instead, they showed her how to do it and she learned that way.  Tr. 59.  She admitted that she spent time on an iPad and could read "a little bit of words" but not bigger words; she could not, for example, pronounce the name "Roscoe" without hearing it pronounced first.  Tr. 60.  When she sends text messages she uses her voice, and when someone writes her back she calls them and asks what they are telling her because she doesn't understand.  Tr. 60-61.  This has been a problem for years, and she compensated by having friends or family fill out applications for her.  Tr. 61.  When asked if she had trouble focusing, Rapp answered that she sometimes could pay attention.  Tr. 61-62.  Rapp's ex-husband drove her to the hearing downtown.  Tr. 62.  She has been downtown before; she puts the address into her phone and it tells her where to go.  Tr. 62.

Rapp stated that she cries about six times a day, for about 10 minutes at a time.  Tr. 63.  When asked what causes her to cry, she answered that she cries sometimes when she is out because people make her uncomfortable.  Tr. 64.  She is scared of people, avoids crowds, and does not have friends.  Tr. 64.  When the ALJ cited an exhibit that referenced that she visits her grandchildren and is regularly involved in outside social activities with friends, Rapp stated that she talks on the phone to a friend and she only "hangs out" with her granddaughters.  Tr. 65.  "And maybe sometimes I go out and see my friend to talk to."  Tr. 65.  But she does not go out all the time with them.  Tr. 66.  She goes to church every Sunday.  Tr. 66.  She sometimes has problems coping with pressure, like bills and kids.  Tr. 66.  The ALJ pointed out an exhibit that referenced that Rapp performed household chores and routine driving, managed her finances, and had her own checking account and credit cards in her name.  Tr. 67.

When asked if she could work full time in a regular competitive job, Rapp stated that she could not due to her hand problems and "people."  Tr. 68.  She explained that what had happened

8

to her in the past is that people had gone to the office and complained about her, things she did wrong, but she had not done anything wrong. Tr. 68.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. Tr. 69-77. The ALJ asked the VE to identify Rapp's past work, the VE questioned Rapp about her past work, and the VE identified her past work as an injection molding machine tender, classified by the DOT as light work but medium work as Rapp performed it. Tr. 69-74. The ALJ asked the VE to determine whether a hypothetical individual of Rapp's age, education, with limited literacy skills, and past work could perform work as an injection molding machine tender, as actually or generally performed, if that person had the limitations that were subsequently assessed in the ALJ's RFC determination. Tr. 74-75. The VE answered that, per the DOT, such an individual could perform work as an injection molding machine tender, as generally performed but not as it was actually performed by Rapp. Tr. 75.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his October 11, 2018, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020. Tr. 13.

2. The claimant has not engaged in substantial gainful activity since February 2, 2016, the alleged onset date. Tr. 13.

3. The claimant has the following severe impairments: osteoarthritis of left and right hand fingers, status-post left index finger fusion; borderline intellectual functioning; anxiety state; and alcohol abuse. Tr. 13.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 13.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except for no climbing ladders, ropes and scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; up to frequent handling and fingering; and mental limitation that she perform simple, routine tasks in a low stress environment (meaning no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (meaning no arbitration, negotiation, or confrontation). Tr. 15-16.

6. The claimant is capable of performing past relevant work as an injection molding tender. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 21.

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2016, through the date of this decision. Tr. 22.

## V. Plaintiff's Arguments

Rapp argues that the ALJ erred with respect to his treatment of the VE's testimony and when he considered the state agency reviewing psychologists' opinions. Doc. 13, p. 11.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err with respect to the VE testimony

The parties agree that an ALJ has an affirmative duty to ask the VE whether the VE's testimony conflicts with the DOT.[3] *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009) (citing SSR 00-4p, 2000 WL 1898704, at *4). And, if the VE's evidence appears to conflict with the DOT, the ALJ must also obtain a reasonable explanation for the apparent conflict. *Id*. However, "[n]othing in S.S.R. 00–4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Id*. at 606 (quoting *Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 374 (6th Cir. 2006)).

Rapp argues that the ALJ committed reversible error because, at the hearing, he did not ask the VE whether his testimony conflicted with the DOT. Doc. 13, p. 13; Doc. 16, pp. 1-2. Defendant submits that the ALJ did not have to ask the VE whether his testimony conflicted with the DOT at the hearing because the VE voluntarily stated at the outset that his answer to the VE's question was consistent with the DOT. Doc. 14, p. 4. The undersigned agrees with Defendant. The ALJ was not required to ask the VE whether his testimony conflicted with the DOT because the VE had already answered that question at the outset of his testimony.

---

[3] See Doc. 13, pp. 12-13; Doc. 15, pp. 3-4.

When the ALJ asked the VE whether a hypothetical individual with Rapp's subsequent RFC assessment could perform her past work, the VE stated that such an individual could perform Rapp's past work as generally performed (light exertional level work) but not as Rapp had actually performed it (medium exertional level work). The following exchange occurred:

> ALJ: [after describing a hypothetical individual with Rapp's subsequent RFC assessment]….Could this individual perform past work as an injection molding tender, either as actually or generally performed?
>
> VE: Per the Dictionary of Occupational Titles, that hypothetical worker could perform the job as an injection molding machine tender, but not [as] actually performed.
>
> ALJ: [after describing a second hypothetical]….Could this individual perform jobs existing in significant numbers in the economy?
>
> VE: That hypothetical worker would not be able to maintain or retain employment at any job in the local or national economy, especially at the entry level. And that opinion, your honor, is not based on the Dictionary of Occupational Titles. The dictionary does not address time off task. That opinion is based on my experience….

Tr. 75.

In his decision, the ALJ adopted an RFC based on the first hypothetical. Because the VE already stated that his answer to the first hypothetical was "per" the DOT, the ALJ was not required to ask the VE if his answer conflicted with the DOT. *See Lindsley*, 560 F.3d at 606 ("Lindsley [has not] identified any authority requiring ALJs to conduct a mechanical recitation of the precise language in S.S.R. 00–4p for the purpose of determining whether there are any inconsistencies."). Moreover, the VE's answer to the second hypothetical question further clarifies that his answer to the first hypothetical was consistent with the DOT, because he took pains to distinguish that his second answer, unlike his first answer, was not consistent with the DOT.

Next, Rapp argues that there was an apparent conflict between the VE's testimony and the DOT definition of injection molding machine tender. Doc. 13, p. 13; Doc. 16, p. 3.

13

Therefore, she asserts, the ALJ should have, but did not, obtain a reasonable explanation for the apparent conflict. Doc. 13, p. 16. In support of her assertion that there was an apparent conflict between the VE's testimony and the DOT definition of injection molding machine tender, Rapp details what the words, letters, and numbers regarding the five components of the "definition trailer" of the DOT mean, citing to "The Guide for Occupational Exploration (GOE)." She analyzes what the GOE components mean and describes its coding structure. She states,

> In the present case, the conflict between the VE testimony and the DOT lies in the occupational analysis characteristics GOE: 06.04.10. The ALJ determined Rapp's RFC included, among other things, the ability to work "in a low stress environment (meaning no fast pace, strict quotas or frequent duty changes)" (TR 15-16). Injection molding machine tender falls within Work Group 06/Industrial in the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") GOE. DOT #556.685-038. The Industrial Work Group is defined as appealing to people with "[a]n interest in repetitive, concrete, organized activities in a factory setting." Appendix A to SCO § 06. "A person can satisfy this interest by working in one of many industries that manufacture goods on a mass production basis. A person may enjoy manual work or using handtools. A person may prefer to operate, take care of, or set up machines; supervise other workers; or inspect, sort, count, or weigh products." *Id*. Certainly this description of an injection molding machine tender suggests that the job involves fast pace and strict quotas to permit the manufacture of goods on a mass production basis. *See Howes v. Astrue*, 2009 WL 232456, at *7-8 (D. Maine Jan. 29, 2009). As such, the DOT and its companion publication the SCO indicate the job of injection molding machine tender is inconsistent with no fast pace or strict quotas because it is a factory position that may very well require fast pace and/or strict quotas to keep up with mass production. In the absence of recognition of, let alone any explanation for, the aforementioned inconsistency, the ALJ erred in relying on the VE's testimony that an individual with Rapp's RFC could perform the job of injection molding machine tender. *E.g., Bennett*, 2016 WL 7395795, at *6-7.

Doc. 13, pp. 15-16. Rapp has not described an apparent, i.e., obvious, conflict between the VE's testimony and the DOT. Rather, Rapp has delved into the GOE codes and referenced the SCO appendix to conclude that the descriptions in these sources "suggest" that the job (which she performed in the past) is a factory position "that may very well require" abilities that the ALJ did not find her to have. In addition to not showing an apparent conflict, Rapp has not shown that there is an actual conflict.

Lastly, Rapp's attorney did not question the VE at the hearing regarding any purported apparent conflict, which undermines her assertion that an apparent conflict existed. *See id.* (observing that the claimant's attorney was afforded a full opportunity to cross examine the VE when the VE stated there was no conflict and that the ALJ was not required to investigate further); *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (observing that the failure of counsel to identify a conflict at the time of the hearing "is not without consequence" because the claimant "now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance[.]").

The ALJ did not err with respect to the VE's testimony.

**B. The ALJ did not err with respect to the state agency reviewers' opinions**

Rapp argues that the ALJ improperly considered the medical opinions of the state agency reviewing psychologists, Drs. Haskins and Waggoner. Doc. 13, p. 16. As relevant here, both doctors found Rapp could not perform work with strict fast paced production demands and handle tasks without strict time limitations or production standards.

The ALJ gave "great" weight to these opinions. Tr. 19-20. He limited Rapp to performing "simple, routine tasks in a low stress environment (meaning no fast pace, strict quotas or frequent duty changes)." Tr. 15. Rapp submits that, despite assigning great weight to the opinions, the ALJ's limitation to low stress work described as no fast pace or strict quotas is insufficient to encompass a limitation avoiding strict production demands. Doc. 13, pp. 17-18. This argument fails. First, an ALJ is not required to adopt all parts of an opinion, even one to which he assigns great weight. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a State agency psychologist's opinions verbatim; nor is the ALJ required to

15

adopt the State agency psychologist's limitations wholesale."); *Stamper v. Comm'r of Soc. Sec.*, 2019 WL 2437813, at *4 (N.D.Ohio May 8, 2019)[4] (citing *Reeves* and *Majors v. Colvin*, 2014 WL 1238477, at *7 (N.D. Ohio March 25, 2014) ("[A]n ALJ is not required to adopt every opinion expressed by a nonexamining medical expert, even when an ALJ overall accords that opinion great weight.")). Moreover, Rapp has not persuasively argued that there is a material difference between no fast pace or strict quotas, on the one hand, and strict production demands, on the other. In other words, the limitations assessed by the state agency reviewers and the ALJ are consistent with one another. Rapp's challenge to the ALJ's consideration of the state agency reviewing psychologists' opinions is without merit.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: July 28, 2020

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[4] *Report and Recommendation adopted*, 2019 WL 2437016 (N.D.Ohio June 11, 2019).